# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**BRIAN H. HERSCHFUS, INDIVIDUALLY AND AS TRUSTEE OF THE BRIAN H. HERSCHFUS AND FERN SHARI HERSCHFUS JOINT REVOCABLE TRUST u/a/d March 22, 1994, as Amended**
Plaintiffs, on behalf of themselves and all others similarly situated

Case No.
Hon.

**v.**

**CITY OF OAK PARK**
a municipal corporation;
**ERIK TUNGATE,** City Manager;
**ROBERT BARRETT**,
Technical and Planning Services Director;
and
**JOHN OR JANE DOE**, code official(s)
Jointly and Severally, Defendants
_____/

**METRO DETROIT LITIGATION GROUP BY: STUART SANDWEISS (P60921)**
Attorney for Plaintiffs
18481 W. Ten Mile Rd., Suite 100
Southfield, MI  48075-2693
(248) 559-2400  Fax (248) 971-1500
stuart@metrodetroitlitigation.com
_____/



**METRO DETROIT
LITIGATION GROUP**

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs Brian H. Herschfus, Individually ("Herschfus") and as

Trustee of the Brian H. Herschfus and Fern Shari Herschfus Joint

Recovable Trust u/a/d March 22, 1994, as Amended ("Trust") on behalf of themselves and all others similarly situated (collectively "Plaintiffs"), through counsel, for their Complaint Defendant City of Oak Park, Michigan (the "City"); Robert Barrett, Technical and Planning Services Director ("Barrett") and the other John Doe and Jane Doe building officials (the "Officials") (collectively "Defendants") state:

## INTRODUCTION

1.      This action is brought on behalf of a class of all persons (the "Class" or "Plaintiffs") who own residential real property in the City of Oak Park, Michigan (the "City") and have:

a.      been forced to "consent" to warrantless searches of their property in violation of both the 4th Amendment to the United States Constitution (as applied to the states through the 14th Amendment) and Article I, Section 11 of the State of Michigan Constitution in order to obtain a "Certificate of Compliance" and/or a "Landlord License" and/or to use, rent, occupy lease and/or sell their property and/or

b.      paid money to the City for warrantless inspection fees; and/or

c.      been fined by the City for failing to have a "Certificate



METRO DETROIT
LITIGATION GROUP

of Compliance" and/or "Landlord License"; and/or

   d.    not been able to use, rent, occupy, lease or sell their property because of the requirement to obtain a "Certificate of Compliance" and/or "Landlord License" from the City following a warrantless search.

2.    Plaintiffs also bring this action pursuant to 42 U.S.C. §1983 for declaratory judgment, injunctive relief, actual and nominal damages, and other relief arising from the unconstitutional policies, practices, and threats of Defendants.

3.    Defendants' policies, practices, and conduct threaten Plaintiffs with irreparable harm to their rights under the Fourth, Fifth, and/or Fourteenth Amendments to the United States Constitution, as well as analogous provisions in the State of Michigan Constitution including Article I, Sections 11 and 17, and such harm may only be remedied by a ruling from this Court.

4.    Defendants have impeded and threaten to further unconstitutionally impede Plaintiffs in their right to be free from warrantless searches without probable cause by maintaining, implementing and enforcing vague policies that (i) threaten Plaintiffs and others with subjection to unduly broad warrantless searches of their



houses and business property without probable cause; (ii) violate Plaintiffs' and others' reasonable expectation of privacy; and (iii) retaliate against Plaintiffs and others' for exercising their Fourth Amendment rights by either (a) threatening or assessing fines against them, and/or (b) depriving them of their property rights, including but not limited to the right to use, rent, occupy, lease and/or sell their property.

5.      As a result of the policies, practices, and customs of the Defendants, as well as certain conduct by one or more Defendants, Plaintiffs will suffer irreparable harm unless the Defendants are immediately enjoined from restricting Plaintiffs' constitutional and statutory rights in this manner.

6.      For the reasons above, Plaintiffs seek, amongst other things, declaratory judgment and injunctive relief determining that the offending provisions of the City's "Code of Ordinances, City of Oak Park, Michigan" (the "Code") are unconstitutional on their face, and as applied to Plaintiffs, and further, that the Code is insufficient to support the issuance of an "administrative" search warrant.



## PARTIES, JURISDICTION AND VENUE

7.     Trust is a trust established pursuant to Michigan law, that owns several parcels residential property (the "Properties") located in the City of Oak Park which are subject to the Code and its inspection requirements including houses located at:

- ▪ 10621 Corning ("Corning");
- ▪ 22720 Rosewood ("Rosewood");
- ▪ 24320 Cloverlawn ("Cloverlawn"); and
- ▪ 21940 Coolidge ("Coolidge").

8.     Defendant City is a municipal corporation located within Oakland County, Michigan; it is created and existing under and by virtue of the laws of the State of Michigan. In fulfilling its duties, the City acts by and through various departments and public officials, including without limitation, Defendants Tungate, Barrett and/or John Doe and/or Jane Doe code officials (collectively the "Officials") referred to as the "Code Official(s)" in the Code.

9.     All actions by the Defendants described herein were undertaken under color of state law, which caused the deprivation of Plaintiffs' rights protected by the United States Constitution and/or the State of Michigan Constitution.



10.    All actions described herein of the Defendant City, its officers, agents, servants, employees or persons acting at their behest or direction, were done and are continuing to be done under the color or pretense of state law and/or the City's Code.

11.    Accordingly, this Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331, as this action arises under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to prevent imminent deprivations, under color of state law, of rights, privileges and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil and constitutional rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; under 28 U.S.C. § 2202, to secure preliminary and injunctive relief and damages; and under 42 U.S.C. § 1988 to grant Plaintiffs' prayer for relief regarding the recovery of costs, including damages, restitution, and reasonable attorney fees.

12.    To the extent necessary, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 USC §1367.



13. Venue is proper within this judicial district and division pursuant to 28 U.S.C. § 1391(b) as Defendants are situated within this judicial district and division, (ii) the Defendants transact business within this District, (iii) the conduct complained of occurred within this district and division; and (iv) the affected properties are located within this district and division.

14. As additional class members are identified, this district and division will remain the most convenient forum in which all future cases can be considered and consolidated as necessary.

## THE NATURE OF THE ACTION

15. Pursuant to the Home Rule City Act (MCL §117.1 et seq.) the State of Michigan permits municipal corporations like City to adopt certain laws, codes, or rules for building maintenance issues.

16. MCL §117.3 (K) specifically addresses the adoption of certain building codes and states:

> Except as otherwise provided under the Stille-DeRossett-Hale single state construction code act, 1972 PA 230, MCL 125.1501 to 125.1531, a city may adopt a law, code, or rule that has been promulgated and adopted by an authorized agency of this state pertaining to fire, fire hazards, fire prevention, or fire waste, and a fire prevention code, plumbing code, heating code, electrical code, building code, refrigeration machinery code, piping code, boiler code, boiler operation code, elevator machinery code, an



METRO DETROIT
LITIGATION GROUP

international property maintenance code, or a code pertaining to flammable liquids and gases or hazardous chemicals, that has been promulgated or adopted by this state, by a department, board, or other agency of this state, or by an organization or association that is organized and conducted for the purpose of developing the code, by reference to the law, code, or rule in an adopting ordinance and without publishing the law, code, or rule in full. The law, code, or rule shall be clearly identified in the ordinance and its purpose shall be published with the adopting ordinance. Printed copies of the law, code, or rule shall be kept in the office of the city clerk, available for inspection by, and distribution to, the public at all times. The publication shall contain a notice stating that a complete copy of the law, code, or rule is made available to the public at the office of the city clerk in compliance with state law requiring that records of public bodies be made available to the general public.

17.     In accordance with the Home Rule City Act and MCL 117.3(K), on or about April 1, 1996, the City enacted Ord. No. O-96-348 (the "Adopting Ordinance"), which adopted the international property maintenance code (the "IPMC") as the code for maintenance of property in the City.  See. Code Sec. 18-231(a) (Exhibit 1), which is incorporated herein by reference.

18.     The IPMC, as adopted by the City, governs the regulation of and maintenance of existing residential real property within the City.

19.     The City has also enacted other code sections including Sections 18-164; 18-165; 18-166; 18-167; 18-168; 18-181; 18-182; 18-183 and 18-184 of the Code (Exhibit 2 - incorporated herein by reference), which require owners of single-family or two-family dwellings located in



METRO DETROIT
LITIGATION GROUP

the City to register their property with the City and obtain Certificate of Compliance and/or a Landlord License for a person to occupy, reoccupy or sell such properties.

20.     Notably, these requirements do not apply to owner occupied homes or to owners of multi-family dwellings such as apartment buildings.

21.     In order to obtain a Certificate of Compliance (which is needed to obtain a Landlord License) the Code gives the City's Director of Technical and Planning Services or his or her designee (the "Officials") the authority to enter, inspect, examine and/or survey the home **without** first obtaining a search warrant.  See eg. Code §18-181 Exhibit 2 herein).

22.     Section 18-183 of the Code (Exhibit 2) further provides a procedure for the Official to obtain a search warrant when the owner or occupant of a rental unit demands a warrant.  However, such procedure is not in accordance with the 4th Amendment to the United States Constitution as applied to the states through the due process clause of the 14th Amendment.  (See generally *Mapp v. Ohio*, 367 U.S. 643 (1961); *Wolf v. Colorado*, 338 U.S. 25 (1949) (in dicta); *Aguilar v. Texas*, 378 U.S. 108 (1964); *Ker v. California*, 374 U.S. 23 (1963).



23.     A fundamental purpose of the 4ᵗʰ Amendment is "to protect against all *general* searches." *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 357 (1931). A "the suspicion-less search is one primary evil the Fourth Amendment was intended to stamp out." See *Boyd,* supra., at 625–630 (1886). Thus, "a search without a warrant demands exceptional circumstances." *McDonald v. U.S.*, 335 U.S. 451, at 454-455 (1948).

24.     Each of these principles apply not just to owner-occupied residential homes, but even to business and commercial property, and even as to administrative and regulatory searches. In *New York v. Burger,* the U.S. Supreme Court held that "[a]n owner or operator of a business thus has an expectation of privacy in commercial property, which society is prepared to consider to be reasonable.  This expectation exists not only with respect to traditional police searches conducted for the gathering of criminal evidence but also with respect to administrative inspections designed to enforce regulatory statutes." *New York v. Burger,* 482 U.S. 691, 699 (1987). And in *Marshall v. Barlow's Inc.,* the Supreme Court added "[i]f the government intrudes on a person's property, the privacy interest suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards." *Marshall v. Barlow's Inc.*, 436 U.S. 307, 312 (1978).


METRO DETROIT
LITIGATION GROUP

25.    The 4th Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: when "the Government obtains information by physically intruding on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment has undoubtedly occurred." *United States v. Jones,* 132 S.Ct. 945, 950–951 (2012). This understanding reflects the reality that, as the United States Supreme Court emphasized, the Amendment expressly protects property and specifically includes "houses" as amongst such property. *See Syllabus to U.S. v. Jones*, 132 S.Ct. 945 (2012).

26.    The Supreme Court is unmistakably clear: "a warrant is generally required for a search of a home." *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006). "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 (1972). "And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest.  It is not surprising, therefore, that the Court has recognized, as 'a "basic principle of Fourth Amendment



METRO DETROIT
LITIGATION GROUP

law[,]" that searches and seizures inside a home without a warrant are presumptively unreasonable.' *Payton v. New York,* 445 U.S., at 586 [100 S.Ct., at 1380]." *Welsh v. Wisconsin,* 466 U.S. 740, 748–749 (1984) (footnote omitted and citation omitted).  The Michigan Supreme Court has held that a search or seizure conducted without a warrant is unreasonable unless the search or seizure falls within a "specifically established and well-delineated" exception to the warrant requirement. *People v. Champion*, 452 Mich. 92, 98 (1996).

27.    In *Steagald v. U.S.*, 451 U.S. 204, 212 (1981) (citing *Payton v. New York*, 445 U.S. 573 (1980) and *Johnson v. United States*, 333 U.S. 10, 13-15 (1948), the Supreme Court explained "The search at issue here took place in the absence of consent or exigent circumstances.  Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." "Thus, as we recently observed: 'In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Id.* In *Donovan v. Dewey,* 452 U.S. 592(1981) (Renquist, concurring), citing *Steagold v. United*



*States*, 451 U.S. 204 (1981) and *Payton v. New York*, 445 U.S. 573 (1980), it was explained "Our prior cases hold that, absent consent or exigent circumstances, the government must obtain a warrant to conduct a search or effect an arrest in a private home." Consequently, "Houses," whether rental or owner-occupied, are entitled to the greatest level of constitutional protection, with respect to government searches.

28.    The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; and the phrase "in their persons, houses, papers, and effects" would have been superfluous. Indeed, The Fourth Amendment "indicates with some precision the places and things encompassed by its protections: 'persons, houses, papers, and effects.'" *Oliver v. United States,* 466 U.S. 170, 176 (1984). Simply put, a "search" occurs for Fourth Amendment purposes when the government physically intrudes upon one of these enumerated areas, or invades a protected privacy interest, for the purpose of obtaining information. *Jones,* supra, at 949–51, (2012); *Katz v. United States,* 389 U.S. 347, 360–61 (1967) (Harlan, J., concurring).



METRO DETROIT
LITIGATION GROUP

29.    The Oak Park Code of Ordinances at issues requires "searches" as the City seeks to obtain information by physically intruding into a constitutionally protected area:  a house.  In fact, wide scope and breadth of the search renders it a *general* search as the City's Pre-Inspection Checklist[1] (EXHIBIT 3) enumerates 40 separate items to be inspected, as disparate as "cabinets and closets", "door hardware and locks," "wall, floor and ceiling surfaces," "lighting," windows", "storage" and "garbage cans".   The Checklist makes clear that a thorough search is to be made of the Interior and Exterior of the Property including the bedrooms, bathrooms, laundry areas, and utility areas, including garages, sheds, pools and decks.  The Code further intrudes on the tenants' right of privacy, mandating that when the Owner applies for a Landlord license the Owner "**shall be deemed to have given consent to the department of technical and planning services to enter any of the listed premises, if necessary, at reasonable times, to inspect such premises**" (Article IV, Sec. 18-168 (emphasis added)) without providing for the protection of the tenant.



---

[1] The Checklist (Exhibit 3) indicates that a landlord may be liable for a misdemeanor infraction for renting a unit prior to attaining a rental certificate.

30.    It can be undisputed that the fruits of this search are used to penalize Landlords as Section 18-164 declares that the intent of the Code "is to maintain all residential buildings in the city in a safe, sanitary and habitable condition in accordance with state and city building and housing codes and to prevent deterioration and blight within the city" and the code allows the city to suspend a certificate and/or impose criminal penalties on a Landlord for noncompliance – even if a tenant is responsible for causing the issue that gives the City concern.

31.    Yet, despite the clear constitutional protection against warrantless searches, the Oak Park Code of Ordinances mandates a "consent" search in order for a landlord to obtain a certificate.  See eg. Section 18-168 of the Code which provides that when the Owner applies for a Landlord license the Owner shall be deemed to have given consent to the department of technical and planning services to enter any of the listed premises, if necessary, at reasonable times, to inspect such premises (Article IV, Sec. 18-168 (emphasis added)).  Not only, does this impact the Landlord, it also fails to provide for the protection of a tenant, such as in the instant case, who has been living in the house (e.g. in Corning) for well over a decade.

32.    While the Code may claim that a Landlord "consents" to this



METRO DETROIT
LITIGATION GROUP

warrantless search, thus abrogating the warrant requirement of the 4th Amendment, this is clearly not the case.

33.    An exception to the warrant requirement exists when a person gives voluntary consent to a search. *People v. Roberts*, 292 Mich. App. 492, 503 (2011).  Whether a person has given voluntary consent to a search is determined by considering the totality of the circumstances. Id. at 503.  However, consent [to search] is not voluntary if it is the result of coercion or duress.  *People v. Bolduc*, 263 Mich App 430, 440 (2004).

34.    Consent may constitute a waiver of Fourth Amendment rights. *Zap v. United States*, 1946, 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477. However, to be valid, a waiver must be "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466. "We of course recognize that consent to a search is not to be lightly inferred, but should be shown by clear and convincing evidence. * * * **Any consent must be voluntary and uncoerced, either physically or psychologically**." *Phelper v. Decker*, 5 Cir. 1968, 401 F.2d 232, 236. *United States v. Fike*, 449 F.2d 191, 192-193 (5th Cir. 1971).

35.    In a case directly on point, *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523 (1967), **the United States**



METRO DETROIT
LITIGATION GROUP

**Supreme Court struck down warrantless annual administrative**
**searches to insure compliance with a city housing code**, holding "that
administrative searches of the kind at issue here are significant
intrusions upon the interests protected by the Fourth Amendment, that
such searches, when authorized and conducted without a warrant
procedure, lack the traditional safeguards which the Fourth Amendment
guarantees to the individual, and that the reasons put forth in *Frank v.
Maryland* and in other cases for upholding these warrantless searches are
insufficient to justify so substantial a weakening of the Fourth
Amendment's protections." *Camara*, 387 U.S. at 534.

36.    In a similar case in the 5ᵗʰ Circuit, the U.S. Court of Appeals
applied *Camara* when it affirmed a District Court's application of
*Camara* to invalidate warrantless rental inspections akin to those
required by the City of Oak Park. See *Dearmore v. City of Garland*, 519
F.3d 517 (2008).  In *Dearmore*, the District Court issued a preliminary
injunction upon considering an ordinance that it described as follows:
"Under the terms of the Ordinance, in order to rent his property, an
owner must obtain a permit.  If a permit is not obtained, the owner
cannot make commercial use of rental property without incurring a
substantial penalty.  When the owner applies for a permit, he must agree



to abide by the Ordinance.  The Ordinance requires that the owner consent to an annual inspection of his rental property . . . It is an offense if an owner rents his property without a permit.  It is also an offense if an owner refuses to allow an inspection by the City.  An owner, therefore, can be fined up to $2,000 per day for renting his property without a permit.  He may also be fined up to $2,000 per day for refusing to allow an inspection of his rental property." *Dearmore v. City of Garland*, 400 Supp.2d 894 (N.D. Tex., 2005).

37.    The *Dearmore* trial court held "*Camara* makes no distinction between owner and tenant, but rather holds that an administrative search of a private residence, including a private residence owned by one person and rented by another, must include a warrant procedure. . . The court finds the City's reasoning unpersuasive because the property owner is being penalized for his failure to consent in advance to a warrantless search . . The alternatives presented to the property owner are to consent in advance to a warrantless inspection, or to face criminal penalties; thus consent is involuntary. On the other hand, if the owner does not consent to the warrantless search, he does not receive a permit. The whole purpose of receiving a permit is to rent the property for commercial purposes.  Without a permit, the owner cannot engage in lawful



commercial activity. The owner is thus faced with equally unavailing situations." *Dearmore,* 400 F. Supp. 2d at 902-903, citing *United States v. Santiago,* 410 F.3d 193, 198–99 (5th Cir.2005); *United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988). Indeed, forced *government* searches of houses, on a mass-scale, of the type here, have never been upheld.

38.   As a result of the City code and the enforcement thereof, hundreds, if not thousands, of homeowners have succumbed to the City's demand and allowed warrantless searches of their properties.

39.   In order to obtain a warrantless inspection of a property, a homeowner is required to pay an Inspection Fee (the "Inspection Fee").

40.   Upon information and belief, the City receives several hundred thousand dollars of revenue per year in Inspection Fees from these warrantless inspections.

41.   Following payment of the Inspection Fee, the Official(s) perform the warrantless inspection of the Property -- presumably under the theory that the homeowner consented (albeit with coerced consent).

42.   The warrantless inspections under these codes and ordinances are performed by the Official(s) who knows, or should know,



the requirements of the IPMC, the Code and/or the other applicable codes.

43.   The City's inspection under these ordinances is governed by the City's adoption of the IPMC and the inspection requires compliance with the IPMC.  Stated another way, a property owner cannot obtain a Certificate of Occupancy from the City until he passes an inspection pursuant to the IPMC.

44.   The IPMC contains its own set of procedural guidelines with which the City must comply.  For example, prosecution of violations for the failure to comport with an inspection performed under the IPMC cannot be issued until a person has failed to comply with a notice of violation served in accordance with Section 107 of the IPMC.

45.   The preamble to the IPMC clearly states: "Chapter 1 is largely concerned with maintaining 'due process of law' in enforcing the property maintenance criteria contained in the body of the code. Only through careful observation of the administrative provisions can the building official reasonably expect to demonstrate that 'equal protection under the law' has been provided."



46.    Section 104.3 of the IPMC (as adopted by the City in Code Section 18-231) allows a Code Official to enter a property to enforce the provisions of the IPMC under certain circumstances:

> Where it is necessary to make an inspection to enforce the provisions of this code, or whenever the code official has reasonable cause to believe that there is in a structure or upon a premises a condition in violation of this code, the code official is authorized to enter the structure or premises at reasonable times to inspect or peform the duties imposed by this code, provided that if such structure or premises is occupied the code official shall present credentials ot the occupant and request entry.  If such structure or premises is unoccupied, the code official shall first make a reaonsable effort to locate the owner, the owner's authorized agent or other persona having charge or control of the structure or premises and rerquest entry.  If entry is refused, the code official shall have recourse to the remedies provided by law to secure entry.

IPMC §104.3

47.    Notably (and presumably in order to attempt to comply with the 4th Amendment) the IPMC does not allow blanket inspections of a property.  Rather consistent with the "reasonableness" and "probable cause" clauses of the 4th Amendment, as applied to the states through the 14th Amendment, the IPMC allows a Code Official to entry a property where there is reasonable cause to believe that there is a violation of the Code.



METRO DETROIT
LITIGATION GROUP

48.     If a Code Official determines that there was a violation of the code, Section 107 of the IPMC (as adopted by the City in Code Section 18-231) sets forth the form of Notice of Violation which must:

1.      Be in writing.

2.      Include a detailed statement of the specific violations and the remedial action required.

3.      Allow a reasonable time for the performance of any act it requires.

4.      Be served upon the owner or his or her agent, or the occupant, as the case may require.

49.     Notwithstanding, the Code omits reference to the specific part of Section 107 of the IPMC that requires the City to inform a property owner of the right to appeal when the City issues a violation notice.

50.     The form of the IPMC required notices (which was adopted by the City) are procedural due process requirements intended to provide the homeowner with adequate notice and an opportunity to be heard in the event of any dispute over the alleged violations of the applicable code. This is especially important where, as here, the violation for failing to comply with the IPMC (and therefore the City's Code requiring a Certificate of Occupancy) is a strict liability offense (See eg IPMC Section 106.3).



51.     The procedural guidelines required by section 106.3 of the IPMC (compliance with a notice or order served in accordance with Section 107 - which requires the City to inform the property owner or owner's authorized agent of the right to appeal) are conditions precedent to the issuance of any penalty.

52.     These procedural guidelines are vital to the fair administration of these codes to ensure that Code Officials are not refusing to acknowledge compliance of a property for items that are not required by the IPMC or other applicable codes. For example, existing buildings are subject to the IPMC but are not subject to the new-construction codes; where a code official purports to require a new-construction code to be complied with on an existing building, the IPMC specifically contemplates an owner's ability to challenge the alleged defect before the imputation of strict liability attaches for failing to comply.

53.     Absent the procedural due process requirements of the IPMC, the City and its Code Officials are free to require any number of unconstitutional and improper demands on homeowners who have no mechanism to challenge them.  This conduct would require homeowners to make repairs and/or capital improvements not required by the Code,



and at great personal expense, out of fear that the City will levy the homeowner's property or throw the homeowner in jail for failure to pay these improperly levied fines.

54.    The due process requirements are further demonstrated as the IPMC's appeal process requires an independent board of appeals to hear these matters.  The IPMC provides that such board members may **<u>not</u>** be employees of the jurisdiction. The IPMC specifically states that the purpose of the appeal is to allow the homeowner to dispute "that the true intent of this code or the rules legally adopted thereunder have been incorrectly interpreted, the provisions of this code do not fully apply, or the requirements of this code are adequately satisfied by other means."

55.    Despite these procedural guidelines required by the IPMC (which the City adopted), the City blatantly refuses to comply with them. Instead, in complete abrogation of the due process requirements of its own ordinances, the City issues civil infraction fines to homeowners such as Plaintiffs for failure to bring properties into compliance with the IPMC and/or for failing to obtain a Certificate of Occupancy pursuant to the Code.  In reality, the City's issuance of a civil infraction stems solely from the owner's alleged failure to comply with the IPMC inspection and regulations.



56.     Moreover, when the City issues deficiency notices under its codes and ordinances and the IPMC, the Deficiency notices never comply with Section 107.2 of the IPMC as, *inter alia*, they fail to inform the homeowner of the right to appeal.

57.     When a homeowner is coerced into allowing a warrantless inspection of a property, an Official inspects the property and the City then issues a property inspection report (the "Inspection Report") that requests that the owner correct alleged code violations in order to obtain a Certificate of Occupancy. These reports specifically allege failures to comply with the IPMC and associated codes (the "Associated Codes").

58.     The sole reason a certificate of compliance would not be issued following an inspection is for a failure to meet the requirements of the IPMC and/or the Associated Codes.

59.     At no point does the City and/or the Report notify the property owner of his right to appeal the Official's decision and/or the Inspection Report pursuant to terms of the IPMC.

60.     The absence of this statutory notice to the Owner is a direct violation of the IPMC.

61.     The absence of this notice to the Owner further precludes the issuance of any court action to enforce the alleged violations as set forth



in Section 106.3 of the IPMC -- which provides that a person can be found guilty of a misdemeanor or civil infraction, based upon strict liability, if the person fails to comply with notice served in accordance with Section 107 (which includes the requirement to inform the property owner of the right to appeal and the city's right to file a lien against the property, as well as a requiring a correction order allowing a reasonable time to make the repairs and improvements required to bring the dwelling unit or structure into compliance with the IPMC).

62.    Upon information and belief, the required notices are not provided to thousands of homeowners in the City who attempt to obtain Landlord Licenses and comply with the IPMC.

63.    Despite the City's repeated and blatant refusal to comply with due process, upon information and belief, the City issues hundreds, if not thousands, of civil infraction and/or misdemeanor violations to landlord homeowners without informing them of their rights and without providing them with the constitutional due process contemplated and required by the IPMC and the City ordinance.

64.    The City further threatens these landlord homeowners with liens, evictions, demolition, daily fines, and even criminal liability in order to extort fines and fees from them to fund their municipality.



65.     Most landlord homeowners are unaware of their rights to appeal or challenge the code official's determination of the applicability of the Code, and because the City fails to notify them of that right, such landlord homeowners are forced to succumb to the power of the City and/or the City Officials and incur substantial costs and/or pay countless fines.

66.     Denying a landlord homeowner the notice of their right to appeal the Code Official's interpretation and determinations under the IPMC has removed any possibility the homeowner has to challenge to the Code Official's determination or interpretation of the IPMC.  In effect, this gives the code Official "*cart blanche*" to make any demand on the homeowner – even those not required by the IPMC – without providing any recourse to the homeowner.  This deprives the landlord homeowner of any due process related to these proceedings.

67.     To the extent someone attempts to challenge the applicability of the Code Official's determination under the IPMC, they can only do so in court under the threat of further punishment or fine.  However, if this occurs, the court is neither permitted, nor in a position to, inquire into the reason for the homeowner's failure to obtain a Certificate of



Occupancy, as, from the Court's perspective, the ordinance is a strict-liability offense.

68.     In essence, the City's actions and inactions have removed a homeowner's ability to confront or challenge the authority of the City or the Official, as the landlord homeowner is repetitively beaten into submission and/or forced to pay hundreds or thousands of dollars merely to be placed back into the same position – ownership of a property that is allegedly not in compliance with the IPMC and no way to challenge the City or Code Official's determinations under the IPMC.

69.     The failure to provide the constitutionally required due process elements set forth in the IPMC in the City's notices violates Plaintiffs' due process rights.

70.     The issuance of a ticket without complying with the administrative provisions of the IPMC also violates Plaintiff' due process rights.

71.     Plaintiffs' due process rights are further infringed because the provisions of the IPMC are overly vague and impose strict criminal or civil liability without explaining what is required to comply with a particular provision and because there is no definable enforcement mechanism, thereby leading to arbitrary and capricious enforcement.



72.     For example, Chapter 1 of the IPMC pertains to "Scope and Administration" and generally sets forth that structures and premises are to be maintained "in good working order" and that repairs, maintenance and the like are to be done in a "workmanlike manner" -- yet the provisions provide no guideposts for what those phrases mean or any guidelines for how an owner can comply.  See eg. IPMC §§ 102.2 and 102.5.  These vague and uncertain standards are further replicated under all other substantive provisions of the IPMC.  See e.g., IPMC §302.1 ("clean, safe and sanitary condition); IPMC §302.3 ("proper state of repair"); IPMC §302.7 ("structurally sound and in good repair"); IPMC §304.1, and IPMC §304.6-.13 ("good repair"); IPMC §305.1 ("good repair, structurally sound and in a sanitary condition"); IPMC §502.1 ("sanitary, safe working condition"); IPMC §504.1 ("properly installed and maintained in good working order").

73.     Instead of providing illuminating guideposts, Section 104.1 of the IPMC provides that the Code Official has the authority to render interpretations of the Code and set forth policies and procedures in order to clarify application of its provisions -- yet the City has not implemented any formal policies or procedures to do so.  This in turn leaves each and every alleged violation of the IPMC to the whim of the Code Official in an



METRO DETROIT
LITIGATION GROUP

"I know it when I see it" fashion.  See also IPMC §§109.1 and 109.2 ("in the opinion of the code official"). It also leaves property owners without any basis to determine how to comply with the IPMC to avoid violations and the imposition of fines, liens, and other enforcement mechanisms.

74.    As such, the Code and the IPMC itself are unconstitutionally vague and should be stricken and all funds received under such unconstitutional enforcement should be returned.

75.    Additionally, the City Code is unconstitutional as it violates the Equal Protection Clause of the 14th Amendment and Article I, Section 2 of the Michigan Constitution by treating landlord homeowners different than homeowners who reside in their properties and who are not required to consent to warrantless searches every two years in order to continue to reside in their properties

**FACTS APPLICABLE TO THE NAMED PLAINTIFFS**

76.    As was outlined above, the named Plaintiffs, Herschfus and/or the Trust (the "Named Plaintiffs') own the Properties located in the City which are subject to the Code and its inspection requirements including houses located at:



- 10621 Corning ("Corning");

- 22720 Rosewood ("Rosewood");

- 24320 Cloverlawn ("Cloverlawn"); and

- 21940 Coolidge ("Coolidge").

77.    In mid-2020 the City sent a letter to the Named Plaintiffs asking the Named Plaintiffs to re-register corning and Rosewood.

78.    In order to attempt to comply with the unconstitutional statute Herschfus went to the City and completed the registration application (the "Application").

79.    However, as part of the Application, the City wanted Herschfus to sign an Affidavit (Exhibit 4) stating:

> I agree to permit the City of Oak Park Department of Technical and Planning and/or its appointees, to enter and perform inspections of the property when the property is vacant.

80.    Herschfus questioned the Affidavit which was the City's attempt at coercing consent to a warrantless search in violation of the 4th Amendment.

81.    In response the City representative told Herschfus that the purpose of the Affidavit was for "emergency purposes only."

82.    In order to attempt to comply with the registration requirement, Herschfus then attempted to amend the Affidavit by



METRO DETROIT
LITIGATION GROUP

striking "when the property is vacant" and inserting the words "in the event of an emergency."

83.     Herschfus then provided the Application, and modified Affidavit along with a check for the fee – which were returned to Herschfus because the City would not accept the change in the Affidavit.

84.     Herschfus subsequently appeared a second time at the City to register the properties with pre-signed forms without change that Herschfus presented to the City with a check for the cost of the registration.

85.     The City would not accept the forms because Herschfus wrote "under protest" alongside his signature.

86.     Herschfus then contacted the City a third time and spoke with Herschfus, Gregg Childs, head of the building department at the City.

87.     Childs then indicated to Herschfus that Childs would request permission from his superior to accept the modified form.

88.     Herschfus indicated to Childs that the offending statement which Herschfus objected to contravened City Ordinance Section 18-183, which states:



In a nonemergency situation where the owner or occupant of the rental unit demands a warrant for inspection of the premises, the department of technical and planning services shall obtain a warrant, stating the address of the unit to be inspected, the nature of the inspection, as defined in this article or other applicable acts, and the reasons for the inspection. It shall be appropriate and sufficient to set forth the basis for inspection (e.g., complaint, area or recurrent violation basis) established in this chapter. The warrant shall state that it is issued pursuant to this section and that it is for the purposes set forth in this article. If the court finds that the warrant is in proper form and in accordance with this article, it shall be issued forthwith.

In the event of an emergency, no warrant shall be required, and any rental unit may be inspected at any time without prior notice if the department of technical and planning services has probable cause to believe that a condition in, or related to, that rental unit constitutes either a present threat to public health, safety and welfare, including, but not limited to, fire, flood, or other threat of serious injury or death.

89.    Childs subsequently contacted Herschfus and indicated that he was he was told that the City would not allow any changes to the form.

90.    On or about September 3, 2020 City then issued civil infraction tickets against Herschfus for the Corning and Rosewood Properties alleging that Herschfus violated Section 18-181 of the Code that provides:

No owner of any rental unit governed by this article, and no agent of such owner, shall hereafter offer to let or hire, any one-family dwelling or any unit in a two-family dwelling, unless such unit has been inspected and a certificate of compliance has been issued by the department of technical and planning services. The department of technical and planning services shall cause such inspection to be had, and such certificate of occupancy to be



METRO DETROIT
LITIGATION GROUP

issued, if the unit meets the minimum requirements of all applicable state and city housing and building codes, within a reasonable time after application therefor and payment of any inspection fee. The certificate of occupancy shall certify that the dwelling unit complies with all applicable provisions of such building and housing codes. An inspection is also required upon each vacancy and re-occupancy of the rental unit. If the rental unit has been issued a certificate of compliance within six months of the vacancy, the owner is permitted to advertise the unit as long as the owner has reported the vacancy and requested a reoccupancy inspection by the rental inspector.

(Code 1973, § 22-24; Ord. No. O-17-634 , § 1, 4-19-17)

91.    Both of the tickets were listed as "1st Offenses" where the proposed fine was $195.00 per ticket.

92.    Herschfus, a licensed attorney, timely appeared to contest both of the tickets and the State of Michigan 45th District Court scheduled them for hearing on April 8, 2021 without notifying Herschfus.  (As a result, the tickets went into default and, later the default was set aside after the court clerk acknowledged that was not served with notice of the April 8, 2021 hearing).

93.    On or about April 9, 2021 the City issued two additional civil infraction tickets on the Corning and Rosewood properties – for similar violations of Section 18-181 of the Code – this time listing the offenses as "2nd Offenses" where the fine was $295.00 per ticket.

94.    Herschfus then contested all of the tickets and Judge Michelle Appel found Herschfus personally liable for the offenses even



METRO DETROIT
LITIGATION GROUP

though the Properties are owned by the Trust and not Herschfus, personally.

95.   Herschfus subsequently filed a Motion for Reconsideration outlining in greater detail why the statutes are unconstitutional.

96.   As of this writing, approximately ten (10) months later, the 45th District Court has not ruled on Herschfus's Motion for Reconsideration.

97.   On or about August 31, 2021 the City issued a "1st Offense" civil infraction tickets against Herschfus for allegedly not registering the Cloverlawn property in violation of Section 18-181 of the Code.

98.   On or about March 3, 2022 the City issued civil infraction additional tickets against Herschfus for Corning and Rosewood allegedly violating Section 18-181 of the Code -- which were identified as "3rd Offenses".

99.   The Cloverlawn (1st Offense) and the Corning and Rosewood (3rd Offense) tickets are all scheduled for hearing on June 1, 2022.

100.  In the interim, in this lawsuit Plaintiffs seek a declaratory judgment that the Oak Park ordinance(s) that require a warrantless search in order to obtain a certificate of occupancy are, *per se,*



METRO DETROIT
LITIGATION GROUP

unconstitutional in violation of the 4th Amendment to the United States Constitution as applied to the states through the 14th Amendment.

101.   Additionally, as is outlined below, and as a direct and proximate result of Defendants' conduct, Plaintiffs seek damages against Defendants based on Defendants' numerous constitutional violations.

102.   As will also be outlined below, Plaintiff seeks certification of a class or classes consisting of all Oak Park homeowners who, *inter alia*, have:

a.   been required to consent to a warrantless search in order to obtain a Biennial Landlord License in violation of the 4th Amendment to the United States Constitution as applied to the states through the 14th Amendment and Article I, Section 11 of the Michigan Constitution; and/or

b.   not been able to use, rent, occupy, lease and/or sell their property because of the City's unconstitutional requirement to obtain a Biennial Landlord License; and/or

c.   been issued violation notices requiring corrective action without the statutory notice that informs the homeowner of the right to appeal; and/or



METRO DETROIT
LITIGATION GROUP

d.    paid fines and/or costs based on the city's violation(s) of the homeowners' constitutional rights and/or violations of the city Code and/or the IPMC; and/or

e.    have been treated differently than non-landlord homeowners in violation of the equal protection clauses of the 14th Amendment to the United States Constitution and/or Article I, Section 2 of the Michigan Constitution.

## SPECIFIC ALLEGATIONS

### COUNT I - DECLARATORY RELIEF

103.   Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.

104.   An actual controversy exists between Plaintiffs and Defendants regarding Defendants' administration of the IPMC and City Code in violation of clearly established constitutional rights.

105.   Accordingly, Plaintiffs are entitled to a declaration of their rights to due process in the context of the IPMC and City Code processes related to inspections, appeals, and obtaining Biennial Landlord Licenses, and thus Plaintiffs ask the Court to order that Defendants must comply with the procedural due process requirements set forth in the



U.S. Constitution; the Michigan Constitution and/or the IPMC, including Plaintiffs' right to avoid a warrantless search without probable cause established by a neutral and detached magistrate, and provide Plaintiffs with a meaningful opportunity to be heard through an appropriate appeal notice, appeal hearing, and other due process requirements as set forth in the IPMC.

106.   Plaintiffs are further entitled to a declaration that the Oak Park Code sections requiring a warrantless search (including but not limited to §§18-168, 18-181, 18-182, and 18-184) are unconstitutional as they violate both the 4th Amendment to the U.S. Constitution as is applied to the states through the 14th Amendment as well as Article Sections 11 and/or 17 of the Michigan constitution.

107.   Plaintiffs are further entitled to a declaration that Oak Park Code §18-183 is unconstitutional as it provides:

> "any rental unit may be inspected at any time without prior notice if **the department of technical planning services has probable cause** to believe that a condition in, or related to, that rental unit constitutes either a present threat to public health, safety and welfare, including but not limited to, fire, flood, or other threat of serious injury or death" –

as the 4th Amendment to the United States Constitution requires probable cause to be determined by a neutral and detached magistrate,



not a a building official.  Similarly Article I, Section 11 of the Michigan Constitution requires an oath or affirmation supporting probable cause for the issuance of a search warrant.

108.  Plaintiffs are further entitled to a declaration that the Oak Park Code sections requiring a warrantless search (including but not limited to §§18-168, 18-181, 18-182, and 18-184) are unconstitutional as they violate the equal protection clauses of the 14th Amendment to the United States Constitution and Article I, Section 2 of the Michigan Constitution by treating tenants (who may be responsible for damages to a property) and/or landlord homeowners different than non-landlord homeowners.

Wherefore, Plaintiffs respectfully ask the Court to:

a.      declare their due process rights, in the context of the IPMC and City Code processes related to inspections, appeals, and obtaining Certificates of Occupancy;

b.      declare that the Oak Park Code sections requiring a warrantless search (including but not limited to §§18-168, 18-181, 18-182, and 18-184) are unconstitutional as they violate both the 4th Amendment to the U.S. Constitution as is applied to the states through



METRO DETROIT
LITIGATION GROUP

the 14th Amendment; the equal protection clause of the 14th Amendment; Article I, Sections 2, 11 and/or 17 of the Michigan constitution.

     c.    declare that Oak Park Code §18-183 is unconstitutional as is attempts to abrogate the need for a warrant issued by a neutral and detached magistrate as is required by the 4th Amendment to the U.S. Constitution as is applied to the states through the 14th Amendment and Article I, Section 11 of the Michigan constitution.

     c.    order that Defendants must comply with the procedural due process requirements set forth in the U.S. Constitution; the Michigan Constitution and/or the IPMC, including the right to avoid a warrantless search without probable cause established by a neutral and detached magistrate; and

     c.    order Defendants to provide Plaintiffs with a meaningful opportunity to be heard through an appropriate appeal notice, appeal hearing, and other due process requirements as set forth in the IPMC.



## **COUNT II - INJUNCTIVE RELIEF**

     109.  Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.



110.   Defendants continue to issue and enforce inspection orders in direct violation of the constitutional due process requirements of the 4th, 5th and/or 14th Amendments to the United States Constitution; Article I, Sections 2, 11 and/or 17 of the Michigan constitution; the IPMC and the City's Code.

111.   Plaintiffs are still being denied their right to challenge the application of the Code as set forth in the IPMC and the City's Code.

112.   Unchecked, Defendants will continue to issue court tickets to Plaintiffs for failing to have their properties registered and/or failure to consent to warrantless searches in order to get their properties registered.

113.   As such, without an injunction, the City will continue to reap an illegal windfall and continue to violate clearly established constitutional rights.

114.   Given these circumstances, the losses to the named Plaintiff and others similarly situated are imminent such that Plaintiffs are entitled to injunctive relief and an order stopping Defendants from their illegal and unconstitutional practices including their Biennial Landlord License scheme as described above.

Wherefore, based on the foregoing, Plaintiffs respectfully ask this Court to issue an injunction stopping Defendants from continuing their illegal and unconstitutional practices -- including the requirement for warrantless searches in order to obtain a Biennial Landlord License and issuing tickets to homeowners who refuse to consent to violation of their constitutional rights as described above.

### COUNT III - VIOLATIONS OF 42 USC §1983

115.   Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.

116.   42 USC §1983 provides for civil liability for deprivation of any right, privileges and immunities carried by the constitution and the laws of the United States and/or the State of Michigan pursuant to the carrying of custom and/or practice of the said governmental unit.

117.   As was outlined above, Plaintiffs have

a.   the constitutional right to be protected from warrantless searches of their property; and/or

b.   the procedural due process right to challenge or otherwise appeal a determination of the City's Code Official before any enforcement or court action was taken; and/or



c.    the constitutional right to rent, occupy, use and/or lease their property without interference by Defendants;

d.    the constitutional right to be treated equal to non-landlord homeowners.

118.  At all material times, Defendants were acting under color of law and under the custom and practice of their respective governmental units.

119.  By

a.    requiring Plaintiff and others similarly situated to consent to warrantless searches in order to obtain a Biennial Landlord License to occupy, use, rent, lease or sell their property(ies); and/or

b.    not notifying Plaintiffs about their right to appeal a determination of the City's code official before any enforcement or court action was taken; and/or

c.    not complying with the IPMC and/or the City Code; and/or

d.    through the other actions described in this Complaint, Defendants, under color of law, willfully and wantonly eliminated and/or disregarded Plaintiff's constitutional rights including those conferred


METRO DETROIT
LITIGATION GROUP

under the 4th and/or 5th Amendments to the United States Constitution (as applied to the states through the due process clause of the 14th Amendment), the 14th Amendment to the United States Constitution and Article I, Sections 2, 11 and 17 of the Constitution of the State of Michigan, and/or other laws of the United States and/or the State of Michigan.

120.   As was set forth above, Defendants then proceeded to prosecute and collect fines and fees from Plaintiffs in violation of Plaintiffs' due process rights.

121.   Through their acts, Defendants have deprived Plaintiffs of their property and related rights and are thus liable to Plaintiffs pursuant to 42 USC §1983 that provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.



METRO DETROIT
LITIGATION GROUP

122.   Defendant City is further liable to Plaintiffs for the individual actions of its employees based on the doctrine of *respondeat superior*.

123.   Defendants acted with deliberate indifference with regard to their actions and/or omissions described herein.

124.   Defendants do not have qualified immunity for their actions as any reasonable person and/or employee of Defendant(s) should have known that such actions were in violation of the rights conferred to Plaintiffs under the 4th and/or 5th Amendments of the United States Constitution (as applied to the states through the due process clause of the 14th Amendment), the 14th Amendment to the United States Constitution; and Article I Sections 2, 11 and 17 of the Constitution of the State of Michigan and/or other laws of the United States and the State of Michigan.

125.   As a direct and proximate result of Defendants' actions, Plaintiff suffered damages, in addition to costs and attorney fees.

126.   42 USC §1988 provides that the Court may assess attorney fees in an action to enforce a provision of 42 USC §1983.

WHEREFORE, based on this Count, Plaintiff asks this Court to determine that Defendants violated Plaintiffs' civil rights in violation of 42 USC §1983 and to award Plaintiffs damages in an amount to be



METRO DETROIT
LITIGATION GROUP

determined against (including costs and attorney fees) for Defendant(s)
violating Plaintiffs' due process rights in violation of 42 USC §1983,
together with exemplary and/or punitive damages, interest, costs and
attorney fees.

### COUNT IV - VIOLATION OF DUE PROCESS
(Failure to provide a proper notice and due process
as required under the IPMC)

127.   Plaintiffs incorporate all other paragraphs of this Complaint
into this Count by reference.

128.   Both the 14th Amendment to the United States Constitution
and Article I, Section 17 of the State of Michigan Constitution provide
that it is unconstitutional for a governmental unit, such as Defendant
City, to deprive a person of their property without due process of law.

129.   The IPMC is intended to provide an owner of real property (a
"Homeowner") with the minimum due process recognized by the United
States and State of Michigan constitutions.

130.   The IPMC requires that a Homeowner must be provided with
a notice of deficiencies and a reasonable time to make repairs or
improvements in order to comply with the applicable code and obtain a
Certificate of Occupancy.



131.   The IPMC requires that the Homeowner be provided with a procedural means to challenge the City's Code Official and their interpretation or application of the IPMC as to the Homeowner.

132.   The IPMC requirements as set forth in the IPMC codified by the City (and referenced in this Complaint) function as a required minimum due process afforded to the Homeowner -- before any legal or other court action can be taken by the City against the Homeowner.  In other words, they are conditions precedent to the City's ability to lawfully issue or seek any fine, fee, or other penalty against the Homeowner.

133.   Both the IPMC and the Code make the failure to obtain a Biennial Landlord License a strict-liability offense.  As such, a court that hears these alleged violations is legally prohibited from hearing any reason for the failure to comply and cannot address any challenges that a homeowner may have to the applicability, construction, or interpretation of the IPMC.

134.   Equally important is Section 111 of the IPMC that requires appeals to be heard by an impartial panel of at least three individuals who are **not** employed by the City and whom are qualified by experience and training in the relevant areas being challenged.



135.   No court is (and can never be) in a position to provide the expertise and impartiality contemplated by the IPMC and the City's own ordinances.  In fact, as was referenced above, a court is only permitted to review the City's allegation(s) under a strict liability theory.  Accordingly the court can only ask one question: "do you have a Biennial Landlord License?"  If the answer is "no," the court is required to find the Homeowner responsible regardless of the reason, regardless of whether a Homeowner is required to give up the Homeowner's 4th Amendment rights against a warrantless search without probable cause of a criminal violation, and regardless of whether or not the City complied with the IPMC's procedural due process requirements prior to issuing the violation in the first place.

136.   The form and manner of strict liability court hearings are not the equivalent of a proper appeal under the IPMC and therefore deprive Homeowners of a meaningful opportunity to be heard and deprive them of any due process.

137.   The City's failures as set forth in this Complaint violate the constitutional due process rights enjoyed by Plaintiffs -- including but not limited to:



METRO DETROIT
LITIGATION GROUP

a.    The City's notices fail to notify the Homeowner of his or her constitutional right to appeal the code official's interpretation of the IPMC and/or failure to provide a reasonable time period in which to correct the alleged deficiencies;

b.    The City's notices fail to notify the Homeowner that the City may lien his property for failing to comply;

c.    Requiring the Homeowner to consent to and pay for a warrantless search in order to obtain a Biennial Landlord License.

d.    The City's failure to allow a Homeowner to challenge the code official's interpretation of the IPMC even if presented with a request to do; and

e.    The City's issuance of fines, fees, and levies to Homeowners without completing these conditions precedent.

138.  City violated Plaintiffs' due process rights.  As a direct and proximate result, Plaintiffs incurred monetary and other damages. Left unchecked, the City and its Officials will continue to administer the IPMC in violation of Plaintiffs' due process rights.

139.  Accordingly, Plaintiffs seek damages against Defendant(s) (including costs and attorney fees) for Defendant(s) violating Plaintiffs' due process rights.



Wherefore, based on this Count, Plaintiffs respectfully ask this Court to award them damages in an amount to be determined against Defendants, together with exemplary and/or punitive damages, interest, costs and attorney fees, for Defendant(s) violating Plaintiffs (the named Plaintiff and others similarly situated) due process rights.

### COUNT V - VIOLATION OF DUE PROCESS
(Forcing Plaintiffs to Forfeit Their Constitutional Rights in order to Occupy, Use, Rent or Sell Property

140.   Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.

141.   Both the 4th Amendment to the United States Constitution and Article I, Section 11 of the State of Michigan Constitution prohibit Defendant City and/or its employees from conducting unreasonable searches of a residential house without a search warrant obtained after a neutral and detached magistrate finds probable cause, supported by oath or affirmation, that a crime was committed.

142.   Thus Plaintiffs have a constitutional right against unreasonable searches and/or seizures where there is no probable cause that a crime was committed and where there is no warrant issued by a neutral and detached magistrate.



METRO DETROIT
LITIGATION GROUP

143. The 14th Amendment to the United States Constitution and Article I, Section 17 of the State of Michigan Constitution both prohibit the City from depriving a person of their property without due process of law and/or just compensation.

144. Thus, Plaintiffs have a protected property interest in using, renting, occupying, leasing and/or selling their property and/or earning income from such rentals or sales.

145. As was outlined above, Section 18-181 of the City's Code provides

> No owner of any rental unit governed by this article, and no agent of such owner, shall hereafter offer to let or hire, any one-family dwelling or any unit in a two-family dwelling, unless such unit has been inspected and a certificate of compliance has been issued by the department of technical and planning services. The department of technical and planning services shall cause such inspection to be had, and such certificate of occupancy to be issued, if the unit meets the minimum requirements of all applicable state and city housing and building codes, within a reasonable time after application therefor and payment of any inspection fee. The certificate of occupancy shall certify that the dwelling unit complies with all applicable provisions of such building and housing codes. An inspection is also required upon each vacancy and re-occupancy of the rental unit. If the rental unit has been issued a certificate of compliance within six months of the vacancy, the owner is permitted to advertise the unit as long as the owner has reported the vacancy and requested a reoccupancy inspection by the rental inspector.

(Code 1973, § 22-24; Ord. No. O-17-634 , § 1, 4-19-17)



METRO DETROIT
LITIGATION GROUP

146.   In order to obtain a Certificate of Occupancy, a person must consent to a warrantless inspection of his/her/its property.  Otherwise, Section 18-183 of the City's Code provides

> In a nonemergency situation where the owner or occupant of the rental unit demands a warrant for inspection of the premises, the department of technical and planning services shall obtain a warrant, stating the address of the unit to be inspected, the nature of the inspection, as defined in this article or other applicable acts, and the reasons for the inspection. It shall be appropriate and sufficient to set forth the basis for inspection (e.g., complaint, area or recurrent violation basis) established in this chapter. The warrant shall state that it is issued pursuant to this section and that it is for the purposes set forth in this article. If the court find that the warrant is in proper form and in accordance with this article, it shall be issued forthwith.

147.   As a matter of practice, the City coerces property managers, homeowners, and tenants into consenting to entry and a search under the threat of fines, penalties, and refusal to issue a Certificate of Occupancy.

148.   As a result, Plaintiffs are deprived of their rights against warrantless searches and otherwise must pay inspection fees, fines and/or penalties in order to gain compliance.

149.   These cited provisions of the IPMC as adopted by the City and/or the City's Code are unconstitutional and unenforceable on their face and their application to Plaintiffs have resulted in violations of Plaintiffs' due process rights.



150.   As is set forth in this Complaint, the City conducts an unconstitutional scheme to require Certificates of Occupancy (the "Certificate of Occupancy Scheme") and has wrongfully collected hundreds of thousands (if not millions) of ill-gotten fees.

151.   City violated Plaintiffs' due process rights.  As a direct and proximate result, Plaintiffs have incurred monetary and other damages. Left unchecked, the City and its Officials will continue to administer the IPMC and the City's Code in violation of Plaintiffs' due process rights.

152.   Accordingly, Plaintiffs seek damages against Defendant(s) (including costs and attorney fees) for Defendant(s) violating Plaintiffs' due process rights.

Wherefore, based on this Count, Plaintiffs respectfully ask this Court to award them damages in an amount to be determined against Defendants, together with exemplary and/or punitive damages, interest, costs and attorney fees, for Defendant(s) violating Plaintiffs' due process rights.

## **COUNT VI - UNJUST ENRICHMENT**

153.   Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.



154.   The City has been extracting fees and/or penalties from Plaintiffs by denying Plaintiffs' procedural due process rights and by conducting the illegal Certificate of Occupancy / Landlord License Scheme as set forth above.

155.   As a result, Defendant City has been unjustly enriched by the amount collected.

156.   Plaintiffs now asks this Court to avoid injustice and the unjust enrichment of Defendant City and to enter judgment in favor of Plaintiffs and against Defendant City in an amount to be determined for the total collected by Defendant City as part of its illegal Certificate of Occupancy / Landlord License Scheme.

Wherefore, based on this Count, Plaintiffs respectfully ask this Court to award them damages in an amount to be determined against Defendants, together with exemplary and/or punitive damages, interest, costs and attorney fees, for Defendant(s) violating Plaintiffs (the named Plaintiff and others similarly situated) due process rights and collecting money that the City is not legally entitled to collect.



## COUNT VII - MUNICIPAL LIABILITY

157.   Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.

158.   As is outlined in this Complaint, the City and its agents have administered the IPMC and the Code in ways that cause and result in denial of Plaintiffs' due process rights.

159.   More specifically, the City, through its policies and customs as are implemented and enforced by their agents, has circumvented the requirements of due process by:

a.     requiring and/or coercing property owners to consent to warrantless inspections of their property in order to obtain a Certificate of Occupancy / Landlord License; and/or

b.     failing to notify property owners of their right to appeal an inspection deficiency notice under the IPMC and/or the City's Code; and/or

c.     failing to notify property owners of a reasonable time in which to cure any alleged deficiencies; and/or

d.     failing to notify property owners of the City's right to place a lien on their property for failing to comply with the IPMC; and/or

e.     ignoring requests for appeals of the Code Officials' interpretations of the IPMC; and/or



METRO DETROIT
LITIGATION GROUP

    f.    issuing tickets and violations against Plaintiffs without first complying with the procedural due process afforded by the IPMC.

160.  In this regard, and as a routine part of their policies and procedures, the City and its agents and/or employees deprived Plaintiffs of their rights to a meaningful opportunity to be heard and their constitutional right to due process.

161.  The City and its agents and/or employees fail in this respect because they are driven by profit making, rather than a legitimate governmental interest in preserving and protecting the safety and welfare of occupants of housing.

162.  The City's desired purpose is to set up homeowners to fail so they can issue tickets that cannot be contested in court in order to generate funding to finance the municipality.

163.  As a direct result of, and due to the driving force behind, the City's and their agents and/or employees refusal to provide constitutional due process, the Plaintiffs, have

    a.    been forced to pay inspection fees out of fear of prosecution; and/or



b.    been forced to take off time from work and/or other activities and/or spend money to have to defend against the City; and/or

c.    been forced to pay unlawful fines out of fear of continued levy (and/or possible jail time); and/or

d.    been forced to perform repairs on property for items not required by the IPMC at the mere whims of the Code Officials.

164.  Given this manner and the form of the City's and their Agent's administration of the IPMC, Plaintiffs have been deprived of their due process right to a meaningful opportunity to be heard.

165.  As a direct and proximate result, Plaintiffs have incurred monetary and other damages and thus Plaintiffs seek damages against Defendant(s) (including costs and attorney fees) for Defendant(s) violating Plaintiffs' due process rights.

Wherefore, based on this Count, Plaintiffs respectfully ask this Court to award them damages in an amount to be determined against Defendants, together with exemplary and/or punitive damages, interest, costs and attorney fees.



METRO DETROIT
LITIGATION GROUP

## <u>COUNT VIII - CLASS ALLEGATIONS</u>

166. Plaintiffs incorporate all other paragraphs of this Complaint into this Count by reference.

167. The named Plaintiff and the putative class members have suffered and continue to suffer similar harm due to the violations noted in this Complaint including but not limited to:

      a.     being forced to "consent" to having their properties inspected without a search warrant; and/or

      b.     being issued tickets and/or fines for refusing to consent to warrantless inspections; and/or

      c.     having to pay for illegal / unconstitutional inspections; and/or

      d.     being forced to have to expend money to make repairs on their properties as a result of the illegal / unconstitutional inspections and the City's failure to notify the class members of their right to appeal the determination(s) unilaterally made by the Code Officials in violation of the IPMC.

      e.     not receiving adequate notice or a meaningful opportunity to be heard followed by multiple levies and/or possible jail time for failure to pay improperly issued fines.



168. **Class Definition**. Plaintiffs seek to certify the following classes:

a. <u>**Class I**</u> - All persons or entities who have been forced to have warrantless searches of their property in violation of both the 4th Amendment to the United States Constitution (as applied to the states through the 14th Amendment) and Article I, Section 11 of the State of Michigan Constitution in order to use, rent, occupy and/or sell their property.

b. <u>**Class II**</u> – All persons or entities who were treated differently by the City in violation of the equal protection clause of the 14th Amendment to the United States Constitution and/or Article I, Section 2 of the Michigan Constitution because they are or were landlord homeowners

b. <u>**Class III**</u> - All persons or entities who paid money to the City for warrantless inspection fees.

c. <u>**Class IV**</u> - All persons or entities who have been prosecuted by and/or fined by the City for failing to have a Certificate of Occupancy and/or a Landlord License.

d. <u>**Class V**</u> - All person or entities who have not been informed of their right to appeal the City's decisions regarding



METRO DETROIT
LITIGATION GROUP

repairs and/or maintenance to their property which forced them to make repairs to their property that were not required under the Code in order to avoid prosecution in court.

    e.   **Class VI** - All persons or entities who have not been able to rent, occupy or sell their property because of the requirement to obtain a Certificate of Occupancy and/or a Landlord License from the City following a warrantless search and/or as a result of delays in obtaining a certificate of occupancy as a result of the City's unlawful enforcement of its Code and the IPMC.

    f.   **Class VII**- All persons or entities who have made repairs pursuant to a deficiency report issued by the City without being provided with notice of their ability to appeal such determination to an impartial board.

169. **Numerosity**. The proposed classes are so numerous that joinder of all members is impracticable. While the exact number of class members is not now known, the named Plaintiff believes the class number is in the thousands. These members may be readily identified from Defendants' own records.



170. **Commonality**. There are questions of law or fact common to the members of the class that predominate over questions affecting only individual members.

171. Among the questions of law or fact common to the class are the following:

a. Does the City have the right to mandate and conduct warrantless searches of property without probable cause that a crime was committed and/or that the property owner / occupant committed the crime?

b. Does the City have the right to charge and/or issue civil infraction tickets to property owners and/or who object to warrantless searches?

c. Does the City have the right to prevent property owners from using, occupying, renting, leasing and/or selling their property if the property owners do not obtain a Certificate of Occupancy and/or Landlord License because they will not consent to a warrantless search and/or because they refuse to comply with the City's requirement(s) for repairs that property owners contest when the City does not follow the proper procedure to entertain such contests?



METRO DETROIT
LITIGATION GROUP

d.      Does the City have the right to prosecute individuals and/or entities who do not obtain a Landlord License and/or Certificate of Occupancy because they will not consent to a warrantless search and/or because they refuse to comply with the City's requirement(s) for repairs that property owners contest when the City does not follow the proper procedure to entertain such contests?

e.      Did the City provide proper notice of appeal as required by the IPMC before attempting to enforce the IPMC and/or the City Code?

f.      Did the City's failure to notify Plaintiffs of their right to appeal deprive Plaintiffs a meaningful opportunity to be heard and the minimum due process required by its own Code, and the Michigan and United States Constitutions?

g.      Does the City's policy of treating landlord homeowners different than non-landlord homeowners or tenants violate the equal protection clauses of the 14th Amendment to the United States Constitution and/or Article I, Section 2 of the Michigan Constitution?



172. **Typicality**. The harm suffered by the named Plaintiffs is typical of the harm suffered by other class members differing only in amount. Accordingly, the claims of the named Plaintiffs are the same as those of the other class members. Resolution of these common questions will determine the liability of Defendant to the named Plaintiffs and the class members in general. Thus, the claims properly form the basis for class treatment in this case.

173. Although the amount of damages between individual class members may vary, the underlying liability issues remain the same as between all members of the class and Defendants.

174. **Adequacy of Representation**. The represented parties will fairly and adequately assert and protect the interest of the class. The named Plaintiffs have already demonstrated its willingness to pursue this litigation on their own behalf, and have no known conflicts with the class members.

175. The named Plaintiffs' counsel will also fairly and adequately represent the interest of the class. Attorney Stuart Sandweiss is experienced in complex litigation, has practiced before this Court for over 22 years, and is well versed in the facts and substantive law underlying the Plaintiffs' claims. Mr. Sandweiss has further successfully



prosecuted previous class actions that were resolved prior to class certification.

176. This class action is maintainable under Fed. R. Civ. Proc. 23.

177. The maintenance of this action as a class action will be superior to other available methods of adjudication in promoting the convenient administration of justice.

178. The prosecution of separate actions by or against individual members of the class could create a risk of inconsistent or varying adjudications with respect to individual members of the class that would confront the party opposing the class with incompatible standards of conduct.

179. The prosecution of separate actions by or against individual members of the class would further create a risk of adjudications with respect to individual members of the class that would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

180. The party opposing the class has acted or refuses to act on grounds that apply generally to the class, so that final equitable, injunctive or corresponding declaratory and monetary relief is



appropriate respecting the class as a whole. Specifically, Defendants have deprived, and continue to deprive, Plaintiffs of their rights as were outlined above, including, but not limited to, their 4th Amendment right to be free from warrantless searches (as applied to the states through the 14th Amendment); their right to be free from warrantless searches as is outlined in Article I, Section 11 of the Michigan Constitution; their right to appeal a deficiency notice of deficiency in violation of the due process rights of the class and their right to use, occupy, rent, lease and/or sell their property; and their right to be treated equally with tenants and/or non-landlord homeowners as is outlined in the equal protection clause of the 14th Amendment to the United States Constitution and Article I, Section 2 of the Michigan Constitution.

181.   The questions of law or fact common to class members predominate over any questions affecting only individual members, and as such a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

182.   As a class action this case will be more manageable than the prosecution of separate actions in various forums and venues.

183.   In view of the complexity and the importance of the constitutional issues and expense of the litigation, the separate claims of



individual class members are insufficient in amount to support separate actions.

184.   It is probable that the amount that may be recovered for individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action.

185.   Plaintiff is not aware of any members of the proposed class that have filed similar litigation, nor is Plaintiff aware of any pending similar litigation in which the City and/or its employees are Defendants.

186.   The class action is the appropriate method for the fair and efficient adjudication of the controversy. The legal and factual bases for the named Plaintiffs' claims are the same as for the claims of all class members. The only difference between individual claims is the severity of the harm and resulting damages. Adjudicating this case on a class wide basis will promote substantial judicial economy by eliminating the likelihood of multiple cases (perhaps thousands) turning on the same questions of law and fact. The class action will also provide the proposed class members with their only meaningful avenue for relief, due to the economy of spreading their litigation costs, thereby reducing each individual's expenses over the class and enabling counsel to pursue the litigation by aggregating the claims. Further, the class action will save



the Defendants the burden of defending multiple suits in multiple

forums.

Wherefore, based on the foregoing, Plaintiffs respectfully ask this

Court to:

a.    determine that this action is proper to be maintained as a

class action pursuant to Fed. R. Civ. Proc. Rule 23;

b.    certify the aforementioned Classes I - VII;

c.    appoint the named Plaintiffs' counsel to represent the

classes;

d.    order Defendants to produce discovery to identify all of the

potential class members; and

d.    ultimately order Defendant to pay Plaintiffs' costs, expenses

and reasonable attorney fees.

Dated: May 30, 2022                    Respectfully submitted,



**METRO DETROIT LITIGATION GROUP**

**By:  STUART SANDWEISS (P60921)**
ATTORNEYS FOR PLAINTIFFS
18481 West Ten Mile Road, Suite 100
Southfield, Michigan  48075
(248) 559-2400  Fax (248) 971-1500
stuart@metrodetroitlitigation.com

## LIST OF EXHIBITS

Exhibit 1 ......................................................City Code Section 18-231(a)

Exhibit 2 ..................................................Code Sections 18-164; 18-165;
18-166; 18-167; 18-168; 18-181;
18-182; 18-183 and 18-184

Exhibit 3 .......................................................Pre-Inspection Checklist

Exhibit 4 ............................................................... City Affidavit Form



METRO DETROIT
LITIGATION GROUP

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**BRIAN H. HERSCHFUS, INDIVIDUALLY AND AS TRUSTEE OF THE BRIAN H. HERSCHFUS AND FERN SHARI HERSCHFUS JOINT REVOCABLE TRUST u/a/d March 22, 1994, as Amended**
Plaintiffs, on behalf of themselves and all others similarly situated

Case No.
Hon.

**v.**

**CITY OF OAK PARK**
a municipal corporation;
**ERIK TUNGATE,** City Manager;
**ROBERT BARRETT**,
Technical and Planning Services Director;
and
**JOHN OR JANE DOE**, code official(s)
Jointly and Severally, Defendants
_____/

**METRO DETROIT LITIGATION GROUP**
**BY:  STUART SANDWEISS (P60921)**
Attorney for Plaintiffs
18481 W. Ten Mile Rd., Suite 100
Southfield, MI  48075-2693
(248) 559-2400  Fax (248) 971-1500
stuart@metrodetroitlitigation.com
_____/



**JURY DEMAND**

Plaintiffs demand a trial by jury.

Dated: May 30, 2022                    Respectfully submitted,

                                       **METRO DETROIT LITIGATION GROUP**

                                       _____

                                       **By:  STUART SANDWEISS (P60921)**
                                       ATTORNEYS FOR PLAINTIFFS
                                       18481 West Ten Mile Road, Suite 100
                                       Southfield, Michigan  48075
                                       (248) 559-2400  Fax (248) 971-1500
                                       stuart@metrodetroitlitigation.com



eLaws | eCases | Counties & Cities of Michigan | Code of Federal Regulations | United States Code |



Search

Sign In    Sign Up

**EXHIBIT 1**

📖 Oak Park
  ◆ Code of Ordinances
    ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS
      ■ Article VI. PROPERTY MAINTENANCE CODE

## § 18-231. Adoption of property maintenance code by reference; amendments.

*Latest version.*

(a)   There is hereby adopted that certain code known as the International Property Maintenance Code, 2015 Edition, as published by the International Code Council, as the property maintenance code of the city for the purpose of regulating and governing the conditions and maintenance of all property, buildings and structures by providing the standards for supplied utilities and facilities and other physical things and conditions essential to ensure that structures are safe, sanitary and fit for occupation and use; and the condemnation of buildings and structures unfit for human occupancy and use, providing for the issuance of permits and collection of fees therefore; and each and all of the regulations, provisions, penalties, conditions and terms of said property maintenance code on file in the office of the city clerk are hereby referred to, adopted, and made a part hereof, as if fully set out in this article, with the additions, insertions, deletions and changes, if any, set forth in this section.

(b)   The International Property Maintenance Code, adopted by the provisions of this article as the property maintenance code of the city, is hereby amended, changed and altered in the following respects:

Section 101.1. Title: These regulations shall be known as the Property Maintenance Code of the City of Oak Park, Michigan, hereafter referred to as "this code."

Section 102.3. Application of Other Codes: Repairs, additions or alterations to a structure, or changes of occupancy, shall be done in accordance with the procedures and provisions of the following codes as currently adopted by the Michigan Department of Licensing and Regulatory Affairs: Michigan Building Code, International Fire Code, Michigan Plumbing Code, Michigan Mechanical Code, National Electric Code (with Part 8 State of Michigan Amendments), The International Fuel Gas Code, NFPA 25 (Standard), and ASTM F1346-91 (Standard).



Case 2:22-cv-11174-SJM-EAS ECF No. 1, PageID.72 Filed 05/30/22 Page 72 of 91

Section 103.1. Code official: References to the "code official" shall be deemed to refer to the City of Oak Park Director of Technical and Planning Services, or his designee.

Section 103.2. Deleted.

Section 103.5. Fees: The fees for activities and services performed by the department in carrying out its responsibilities under this code shall be determined by resolution of the City Council from time to time adopted.

Section 106.4. Violation Penalties: Any person, firm or corporation, who shall violate any provision of this code shall, upon conviction thereof, be deemed Responsible for a Municipal Civil Infraction.

Section 110. Deleted. The provisions contained in Section 110, Demolition, of the Property Maintenance Code, shall be and hereby are deleted.

Section 111.2. Board of Appeals: The City of Oak Park Building Board of Appeals shall serve as the board of appeals required by this Property Maintenance Code. All references herein to the "Board of Appeals" or the "Board", shall be deemed to refer to the Oak Park Building Board of Appeals.

Section 111.2.1. Deleted.

Section 112.4. Failure to Comply: Any person who shall continue any work after having been served with a stop work order, except such work as that person is directed to perform to remove a violation or unsafe condition, shall be liable to a fine of not less than $50.00 dollars or more than $500.00 dollars.

Section 302.4. Weeds: All premises and exterior property shall be maintained free from weeds or plant growth in excess of eight inches (254mm). All noxious weeds shall be prohibited. Weeds shall be defined as all grasses, annual plants and vegetation, other than trees or shrubs provided; however, this term shall not include cultivated flowers and gardens.

Section 304.14. Insect screens: During the period from April 1 to December 1, every door, window and other outside opening required for ventilation of habitable rooms, food preparation areas, food service areas or any areas where products to be included or utilized in food for human consumption are processed, manufactured, packaged or stored, shall be supplied with approved tightly fitting screens of not less than 16 mesh per inch (16 mesh per 25 mm) and every swinging door shall have a self-closing device in good working condition.

Exception. Screens shall not be required where other approved means, such as air curtains or insect repellent fans, are employed.



Section 308.2.1. Rubbish Storage Facilities: The owner of every multi-family premises shall supply approved covered containers for rubbish, and the owner of the premises shall be responsible for the removal of rubbish.

Section 308.2.2. Deleted.

Section 308.3.1. Garbage Facilities: The owner of every dwelling shall supply one of the following: an approved mechanical food waste grinder in each dwelling unit; or an approved leak-proof, covered, outside garbage container.

Section 602.3. Heat Supply: Every owner and operator of any building who rents, leases or lets one or more dwelling unit, rooming unit, dormitory or guest room on terms, either expressed or implied, to furnish heat to the occupants thereof shall supply heat during the period from October 1 to May 15 to maintain a temperature of not less than 68° Fahrenheit (20° Celsius) in all habitable rooms, bathrooms, and toilet rooms.

Exceptions:

1. When the outdoor temperature is below the winter outdoor design temperature for the locality, maintenance of the minimum room temperature shall not be required provided that the heating system is operating at is full design capacity. The winter outdoor design temperature for the locality shall be as indicated in Appendix D of the Michigan Plumbing Code.
2. In the areas where the average monthly temperature is above 30°F (-1°C) a minimum temperature of 65°F (18°C) shall be maintained.

Section 602.4. Occupiable Work Spaces: Indoor occupiable work spaces shall be supplied with heat during the period from October 1 to May 15 to maintain a temperature of not less than 65° Fahrenheit (18° Celsius) during the period the spaces are occupied.

Exceptions:

1. Processing, storage and operation areas that require cooling or special temperature conditions.
2. Areas in which persons are primarily engaged in vigorous physical activities.

Section 605.2. Receptacles: Every habitable space in a dwelling shall contain at least two separate and remote receptacle outlets. Every laundry area shall contain at least one grounded-type receptacle or receptacle with a ground fault circuit interrupter. Every bathroom shall contain at least one receptacle with ground fault circuit interrupter protection. All receptacle outlets shall have the appropriate faceplate cover for the location.

Section 606. Deleted.



Section 704.2. Smoke Alarms: Single or multiple-station smoke alarms shall be installed and maintained in groups R-2, R-3, R-4 and in dwellings not regulated in Group R occupancies, regardless of occupant load at all of the following locations:

1. In each sleeping room or ceiling or wall directly outside each sleeping room.
2. In each story within a dwelling unit, including basements and cellars but not including crawl spaces and uninhabitable attics. In dwelling or dwelling units with split levels and without an intervening door between the adjacent levels, a smoke alarm installed on the upper level shall suffice for the adjacent lower level, provided that the lower level is less than one full story below the upper level.

Single or multiple-station smoke alarms shall be installed in all groups in accordance with the Michigan Building Code.

(Code 1973, § 9-51; Ord. No. O-95-341, § 1, 7-3-95; Ord. No. O-06-523, § 1, 5-1-06; Ord. No. O-08-553, § 1, 11-3-08; Ord. No. O-14-602, § 1, 4-7-14; Ord. No. O-14-606 , § 1, 12-1-14; Ord. No. O-17-652 , § 1, 10-2-17; Ord. No. O-18-659 , § 1, 1-3-18)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.

§ 18-164. Purpose and intent - Division 2. LICENSES. Article IV. H...

Case 2:22-cv-11174-SJM-EAS   ECF No. 1, PageID.75   Filed 05/30/22   Page 75 of 91

http://eakpmk.ui.elaws.us/...de/?page_ch18_artiv_div2_sec18-164



Sign In    Sign Up

**EXHIBIT 2**

📖 Oak Park
   ■ Code of Ordinances
      ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS
        ■ Article IV. HOUSING
         ■ Division 2. LICENSES

## § 18-164. Purpose and intent.

*Latest version.*

The purpose of this article is to protect the public health, safety and welfare of people in residential buildings to be occupied or reoccupied due to rental or lease agreements by requiring the registration and licensing of landlords and the inspection of one-family and two-family rental or lease units on a periodic basis or on reoccupancy. The intent of this article is to maintain all residential buildings in the city in a safe, sanitary and habitable condition in accordance with state and city building and housing codes and to prevent deterioration and blight within the city.

(Code 1973, § 22-20(a))

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.



Sign In    Sign Up

 Oak Park
    Code of Ordinances
        Chapter 18. BUILDINGS AND BUILDING REGULATIONS
        Article IV. HOUSING
        Division 2. LICENSES

## § 18-165. Definitions.

*Latest version.*

The following words, terms and phrases, when used in this article, shall have the meanings ascribed to them in this section, except where the context clearly indicates a different meaning:

Owner means, when applied to single-family or two-family dwellings to be rented or occupied under any lease or agreement for any consideration, and shall include any part-owner, joint-owner, tenant-in-common, joint tenant or tenant by the entirety, or the whole or part of the dwellings, or any person who delivers or purports to deliver possession of the dwellings, with or without a possessory interest therein, their agents, servants, employees, or others acting on their behalf.

Rental agreement means an agreement whereunder an owner delivers possession of and/or permits to be occupied, any single-family dwelling or unit of a two-family dwelling for any consideration wherein payments made are equivalent to or constitute rent.

Rental unit means a single-family dwelling or unit in a two-family dwelling which an owner delivers possession of and/or permits to be occupied under any lease or rental agreement.

(Code 1973, § 22-20(b))

## CROSS REFERENCE

Definitions generally, § 1-2.

Disclaimer | Terms of Use | Privacy Policy | Contact Us | Feedback
Copyright © 2021 by eLaws. All rights reserved.

eLaws | eCases | Counties & Cities of Michigan | Code of Federal Regulations | United States Code |



Sign In   Sign Up

  Oak Park

   ■ Code of Ordinances

      ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS

         ■ Article IV. HOUSING

         ■ Division 2. LICENSES

## § 18-166. Registration of landlord application.

*Latest version.*

Every owner of a single-family or two-family dwelling located in the city which is or will be rented or occupied under an arrangement wherein payments made are equivalent to or constitute rent, or for other consideration, shall register with the city department of technical and planning services as provided in this division and make application for a biennial landlord license. No single-family dwelling and no unit in any two-family dwelling in the city shall be rented or occupied under an arrangement wherein payments made are equivalent to or constitute, rent or for other consideration, unless the owner thereof has registered with the department and has been issued a current landlord license.

(Code 1973, § 22-21; Ord. No. O-14-607 , § 1, 12-1-14)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.



     Sign In   Sign Up

📖 Oak Park
   📄 Code of Ordinances
      📄 Chapter 18. BUILDINGS AND BUILDING REGULATIONS
      📄 Article IV. HOUSING
         📄 Division 2. LICENSES

## § 18-167. Contents of application; term; fee.

*Latest version.*

A landlord license shall be issued biennially, effective the date of registration. Application for a license shall be made on forms provided by the department of technical and planning services. Required information shall include the name, address, and telephone number of the property owner, including the names of any partners, corporate officers, or other individual persons or entities having an interest in the property, and for any managing agent. For each individual owner and for each individual managing agent, a driver's license number or a State of Michigan identification number must be provided. For each property owned by a corporate entity, limited liability company, or partnership, the entity's tax identification number must be provided. Also for each corporate entity, limited liability company, or partnership, the name, address and telephone number of its managing officer and its resident agent must be provided. The name, address, and telephone number of any person(s) responsible for property maintenance, if other than the owner, shall be noted on the application form. All applicant information provided must be legible, and the application form must be signed by all owners and agents. The department of technical and planning services may require additional information as may be relevant and necessary to the proper implementation and enforcement of this section. The city council, by resolution, may establish a fee for issuance of such annual license.

(Code 1973, § 22-22; Ord. No. O-14-607 , § 2, 12-1-14; Ord. No. O-18-676 , § 1, 10-15-18)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.





Sign In    Sign Up

📖 Oak Park
    ▶ Code of Ordinances
        ▶ Chapter 18. BUILDINGS AND BUILDING REGULATIONS
        ▶ Article IV. HOUSING
            ▶ Division 2. LICENSES

## § 18-168. Registry of landlords, rental units; consent to inspection of premises.

*Latest version.*

The department of technical and planning services shall maintain a registry of landlords and rental units governed by this article, which shall list all rental dwelling units in the city, and the owners thereof, a description of the rental unit as being either a single-family dwelling or two-family dwelling, and whether the unit is vacant or occupied. Included with the application for a license, and in subsequent renewals shall be an affidavit and agreement, signed by the property owner, permitting inspections of their property by the department of technical and planning services, agreeing to make good-faith efforts to obtain lessee consent in all future inspections, and affirming that tenants of the subject properties have been informed of the regulations contained in this division and of inspections of the properties by the department of technical and planning services. A copy of the affidavit shall be provided to all tenants. A landlord is not required to obtain lessee consent in all future inspections if any of the following apply: (a) the rental unit is vacant; (b) the lease authorizes an enforcing agency inspector to enter the rental unit for an inspection. If the lease is not present during the inspection, the department of technical and planning services may rely upon the landlord's representation that the lessee has consented to the inspection.

(Code 1973, § 22-23; Ord. No. O-18-677 , § 1, 10-15-18)

Disclaimer    |    Terms of Use    |    Privacy Policy    |    Contact Us    |    Feedback
Copyright © 2021 by eLaws. All rights reserved.

Case 2:22-cv-11174-BJM-EAS ECF No. 1, PageID.80 Filed 05/30/22 Page 80 of 91



Sign In    Sign Up

 Oak Park

    ■ Code of Ordinances

        ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS

            ■ Article IV. HOUSING

                ■ Division 3. INSPECTIONS

## § 18-181. To determine compliance with applicable codes; certificates of compliance and occupancy.

*Latest version.*

No owner of any rental unit governed by this article, and no agent of such owner, shall hereafter offer to let or hire, any one-family dwelling or any unit in a two-family dwelling, unless such unit has been inspected and a certificate of compliance has been issued by the department of technical and planning services. The department of technical and planning services shall cause such inspection to be had, and such certificate of occupancy to be issued, if the unit meets the minimum requirements of all applicable state and city housing and building codes, within a reasonable time after application therefor and payment of any inspection fee. The certificate of occupancy shall certify that the dwelling unit complies with all applicable provisions of such building and housing codes. An inspection is also required upon each vacancy and re-occupancy of the rental unit. If the rental unit has been issued a certificate of compliance within six months of the vacancy, the owner is permitted to advertise the unit as long as the owner has reported the vacancy and requested a re-occupancy inspection by the rental inspector.

(Code 1973, § 22-24; Ord. No. O-17-634 , § 1, 4-19-17)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback

Copyright © 2021 by eLaws. All rights reserved.

eLaws | eCases | Counties & Cities of Michigan | Code of Federal Regulations | United States Code |



Sign In   Sign Up

-  Oak Park
    - Code of Ordinances
        - Chapter 18. BUILDINGS AND BUILDING REGULATIONS
        - Article IV. HOUSING
        - Division 3. INSPECTIONS

## § 18-182. Frequency of inspections; reasons therefor.

*Latest version.*

(a)  The department of technical and planning services shall inspect rental units regulated by this article on a periodic basis and upon re-occupancy, provided that in no event shall the period between inspections exceed two years. All scheduled inspections identified in this section shall be undergone in the following manner:

(1)  Absent the mutual agreement of the department of technical and planning services and the property owner, landlord or other person in charge of the premises to be inspected, inspections made pursuant to this subsection shall be conducted only between the hours of 8:00 a.m. and 6:00 p.m., Monday through Friday.

(2)  Except as provided in subsections (4), (5) and (6) below, the department of technical and planning services or its respective agent must request and receive consent from the lessee to enter a unit and perform an inspection. Notifying at least one lessee and obtaining the consent of at least one lessee satisfies the requirements of this subsection.

(3)  Upon notification of an inspection from the department of technical and planning services, the property owner shall notify the lessee of the department of technical and planning's request to inspect, and shall make a good faith effort to obtain the lessee's consent for the inspection.

(4)  Common area access. The property owner shall provide access to common areas and other areas open to the public without the need to obtain any lessee consent.

(5)  Owner provided access. The property owner shall provide the department of technical and planning services access to each rental unit upon a properly notified and requested inspection if any of the following apply:

a.   The lease authorizes an enforcing agency inspector to enter the rental unit for an inspection.

     b.   The lessee has made a complaint to the city.

     c.   The rental unit is vacant.

     d.   The department of technical and planning services serves an administrative warrant, obtained pursuant to section 18-183, ordering the owner to provide access to the rental unit.

     e.   The lessee has consented to an inspection under subsection (3). If a lessee is not present during the inspection, the enforcing agency may rely on the owner's representation to the enforcing agency that the lessee has consented to the enforcing agency's inspection.

(6)   Lessee provided access. The lessee shall provide the department of technical and planning services access to the rental unit upon a properly notified and requested inspection if any of the following apply:

     a.   The lease authorizes an enforcing agency to enter the rental unit for an inspection.

     b.   The lessee made a complaint to the city.

     c.   The department of technical and planning services serves an administrative warrant, obtained pursuant to section 18-183, ordering the owner to provide access to the rental unit.

     d.   The lessee has given consent.

(b)   An inspection shall be conducted in a manner best calculated to secure compliance with this section and appropriate to the needs of the community, including, but not limited to, on one or more of the following bases:

(1)   An area basis, such that all regulated premises in a predetermined geographical area will be inspected simultaneously, or within a short period of time.

(2)   A complaint basis, such that complaints of violations will be inspected within a reasonable time.

(3)   A recurrent violation basis, such that those premises which are found to have a high incidence of recurrent or uncorrected violations will be inspected more frequently.

(4)   A compliance basis, under which a premises brought into compliance before the expiration of a certificate of compliance or any requested repair order may be issued a certificate of compliance for the maximum renewal certification period authorized by this chapter.

(c)   The city council, by resolution, may establish a reasonable fee for inspections conducted pursuant to this article.

(d)   Upon learning that any rental unit governed by this article has been vacated, the department of technical and planning services shall post the premises, in a

prominent place, a written notice stating that the re-occupancy of such unit pursuant to any lease or rental agreement is prohibited by ordinance of the city until such unit has been inspected and a certificate of compliance issued by the department of technical and planning services, together with a statement of the penalties provided for violation of such requirement or for removing the notice. A copy of the notice shall be sent by certified mail to the owner of the rental unit. It shall be a misdemeanor for any person to remove such notice, other than the building official or his designee, upon issuance of a certificate of compliance or upon a determination that the subject property is no longer a rental unit.

(e)   Upon learning that any single-family or two-family dwelling in the city is being offered as a rental unit, the department of technical and planning services shall post on the premises, in a prominent place, a written notice stating that the occupancy of such unit pursuant to any lease or rental agreement is prohibited by ordinance of the city until the owner of such dwelling has registered, made application for, and received a landlord license pursuant to the provisions of this article and the rental unit has been inspected and a certificate of compliance issued by the department of technical and planning services. The notice shall include a statement of the penalties provided for violation of such requirement or for removing the notice. A copy of the notice shall be sent by certified mail to the owner of the rental unit. It shall be a misdemeanor for any person to remove such notice, other than the building official or his designee upon issuance of a certificate of compliance or upon a determination that the subject property is no longer a rental unit.

(Code 1973, § 22-25; Ord. No. O-10-575, § 1, 11-1-10; Ord. No. O-18-678 , § 1, 10-15-18)

Disclaimer   |   Terms of Use   |   Privacy Policy   |   Contact Us   |   Feedback
Copyright © 2021 by eLaws. All rights reserved.



                                    Sign In   Sign Up

📖 Oak Park
    ■ Code of Ordinances
        ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS
        ■ Article IV. HOUSING
            ■ Division 3. INSPECTIONS

## § 18-183. Warrant for nonemergency inspections; not required in emergency situations.

*Latest version.*

In a nonemergency situation where the owner or occupant of the rental unit demands a warrant for inspection of the premises, the department of technical and planning services shall obtain a warrant, stating the address of the unit to be inspected, the nature of the inspection, as defined in this article or other applicable acts, and the reasons for the inspection. It shall be appropriate and sufficient to set forth the basis for inspection (e.g., complaint, area or recurrent violation basis) established in this chapter. The warrant shall state that it is issued pursuant to this section and that it is for the purposes set forth in this article. If the court finds that the warrant is in proper form and in accordance with this article, it shall be issued forthwith.

In the event of an emergency, no warrant shall be required, and any rental unit may be inspected at any time without prior notice if the department of technical and planning services has probable cause to believe that a condition in, or related to, that rental unit constitutes either a present threat to public health, safety and welfare, including, but not limited to, fire, flood, or other threat of serious injury or death.

(Code 1973, § 22-26; Ord. No. O-18-679 , § 1, 10-15-18)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.

eLaws | eCases | Counties & Cities of Michigan | Code of Federal Regulations | United States Code |



Sign In   Sign Up

 Oak Park

    ■ Code of Ordinances

       ■ Chapter 18. BUILDINGS AND BUILDING REGULATIONS

          ■ Article IV. HOUSING

             ■ Division 3. INSPECTIONS

## § 18-184. Suspension and diversion of rental payments.

*Latest version.*

(a)   When the department of technical and planning services has not issued a certificate of occupancy or when such certificate, once issued, has been suspended, or when such certificate has been withheld pending compliance, no one-family dwelling or unit in a two-family dwelling which has not been rented or occupied under a lease or other agreement shall be so rented or occupied. Any one-family dwelling or unit in a two-family dwelling which has been so rented or occupied may be ordered vacated until reinspection and proof of compliance in the discretion of the department of technical and planning services.

(b)   A certificate of occupancy shall be issued on condition that the premises remain in safe, healthful and fit condition for occupancy. If upon reinspection the department of technical and planning services determines that conditions exist which constitute a hazard to health or safety, the certificate shall be immediately suspended as to affected areas and the areas may be vacated as provided in subsection (a) of this section.

(c)   The duty to pay rent in accordance with the terms of any lease or other agreement, wherein payments made are equivalent to or constitute rent, shall be suspended, and the suspended rentals shall be paid into an escrow account as provided in subsection (d) of this section during the period when the premises have not been issued a certificate of occupancy, or when such certificate, once issued, has been suspended. This subsection does not apply until the owner has had a reasonable time after notice of violations to apply for and obtain a certificate of occupancy from the department of technical and planning services. Nor does this subsection apply where, after inspection, the owner establishes that the conditions which constitute a hazard to health or safety were caused by the occupant or occupants. The rent, once suspended, shall again become due in accordance with the terms of the lease or agreement from and after the issuance or reinstatement of the certificate of

occupancy.

(d)   Rents, or payments constituting rent, due for the period during which rent is suspended shall be paid into an escrow account established by the city treasurer, to be paid thereafter to the landlord or any other party authorized to make repairs, to defray the cost of correcting the violations. If, after initial inspection of the premises, no violations exist and a certificate of occupancy is issued by the department of technical and planning services, the city treasurer shall return to the landlord any unexpended sums paid under this section, attributable to the unexpired portion of the rental period. The city treasurer shall return any unexpended part of sums paid under this section, attributable to the unexpired portion of the rental period, where the occupant terminates his tenancy or right to occupy prior to the undertaking to repair.

(e)   When the certificate of occupancy has been suspended, or has not been issued, and the rents thereafter withheld are not paid into the escrow account, actions for rent and for possession of the premises for nonpayment of rent may be maintained, subject to such defenses as a tenant or occupant may have upon the lease or any other agreement between the parties.

(Code 1973, § 22-27)

Disclaimer  |  Terms of Use  |  Privacy Policy  |  Contact Us  |  Feedback
Copyright © 2021 by eLaws. All rights reserved.



# CITY OF OAK PARK

### DEPARTMENT OF TECHNICAL & PLANNING SERVICES

**EXHIBIT 3**

## RENTAL INSPECTION CHECKLIST

*Please review the following checklist. These are, but not limited to, the items that the rental inspector will look for when inspecting your rental property.*

### Interior

- ☐ All wall, floor, and ceiling surfaces, including cabinets and closets, shall be free of defects, stains, and dirt and debris.
- ☐ Every interior stairway, toilet room, kitchen, bathroom, laundry room, boiler and furnace room shall contain at least one electric luminaire (hard wired light).
- ☐ Every habitable space in a dwelling shall contain at least two separate and remote receptacle outlets. Outlets and switches are to be free of damage, defects, and paint.
- ☐ Every bathroom shall contain an openable window or an approved mechanical exhaust fan.
- ☐ Sleeping areas are not allowed in basements unless proper egress windows or equivalent are installed.
- ☐ Every interior or exterior flight of stairs having more than four risers, and every open portion of a stair, landing or balcony which is more than 30 inches above the floor or grade below shall have handrails and guards.
- ☐ All doors must be properly sealed, be in good repair, have all necessary hardware, and open and close freely.
- ☐ All deadbolt locks must be "thumb-turn" type. Keyed deadbolts (use of key to unlock door from the inside) are prohibited.
- ☐ All windows shall be free of cracks and chips, be in good maintenance, have properly sealed glazing, and work as the manufacturer intended.
- ☐ Screens shall be installed on all openable windows from April 1 to December 1 and be free of defects.
- ☐ All windows must open and close freely and lock.
- ☐ All peeling paint on the interior shall be repaired.
- ☐ All sinks, toilets, showers, tubs, and plumbing shall be free from leaks, properly maintained, and correctly installed.

### Utility and Safety

- ☐ **Smoke Alarms**: Single or multiple-station smoke alarms shall be installed and maintained regardless of occupant load at **all** of the following locations:
  - ☐ On the ceiling or wall, four inches from the ceiling, outside of each separate sleeping area in the immediate vicinity of bedrooms.
  - ☐ In each room used for sleeping purposes.
  - ☐ In each story within a dwelling unit, including basements and cellars but not including crawl spaces and uninhabitable attics.
- ☐ **Furnace and fireplace inspection**: You must have the furnace, fireplace, and/or boiler inspected for safe operation, serviceability, and carbon monoxide leaks in the home or apartment by a Michigan State Licensed Furnace or Boiler Inspector. A copy of the inspection certification is required to be on file in the Building Department.
- ☐ Seal around the furnace and water heater flue pipes where they penetrate the basement wall or chimney. This must be done with approved chimney cement.

- ☐ Storage shall not be located within three feet of the furnace or water heater or in front of electrical panels.
- ☐ Combustible, flammable, explosive or other hazardous materials, such as paints, volatile oils and cleaning fluids, or combustible rubbish shall not be stored in the dwelling or where they may pose a hazard on or at the property.
- ☐ The pressure temperature discharge pipe on the water heater must not end higher than four inches above the floor. The discharge pipe shall be an approved material.
- ☐ Every laundry area shall contain at least one <u>grounded</u> type receptacle.
- ☐ Utility sinks must have vacuum breaker attached to the faucet.
- ☐ An approved metal dryer vent must be attached to the clothes dryer. If the tenant is to supply the dryer, than dryer vent ducting shall be installed and readily available for hookup.
- ☐ The property shall be free of mold, mildew, and animal/insect infestation.
- ☐ Every bathroom shall have GFCI type electrical receptacle.
- ☐ Nonworking, defective, or obsolete systems or parts of systems shall be fully removed or repaired.

### Exterior
- ☐ Yards must be maintained, grass cut, and scrub trees and invasive vegetation removed.
- ☐ Fences must be maintained and properly erected.
- ☐ Garages, shed, pools, decks, etc., must be in good repair and free of hazards.
- ☐ Property must be free from debris, garbage, and rubbish.
- ☐ Garbage cans must be stored behind house.
- ☐ No disabled vehicles are allowed to be stored on property
- ☐ Exterior surfaces must be sealed against the weather and free from rotting wood and peeling paint.
- ☐ All hose bibs must have a vacuum breaker attached.
- ☐ Bricks and mortar shall be free of spalling and cracks.

### Permits and workmanship
- ☐ Michigan state law mandates that all alterations, additions, and changes to mechanical, plumbing, electrical, and building systems at rental properties be done by a State Licensed Contractor with permits and approval from the respected City Inspectors.
  Repairs, maintenance work, alterations or installations shall be executed and installed in a workmanlike manner and installed in accordance with the manufacturer's installation instructions.

For a full list of rental codes, you may read the 2012 International Property Maintenance Code located in the Oak Park Library or online at: http://www2.bgky.org/assets/files/aqoB3Kn5.pdf

Per Oak Park's rental ordinance, you may be liable for a misdemeanor infraction for renting the unit prior to attaining a rental certificate.

*Owner/landlords are expected to have these requirements met prior to the inspection. In order to complete inspections quicker, we ask that all windows are accessible and the blinds or shades are open.*



# CITY OF OAK PARK

### DEPARTMENT OF TECHNICAL & PLANNING SERVICES

## EXHIBIT 4

## _RESIDENTIAL PROPERTY RENTAL REGISTRATION_

*Rental Registration fee - **$80 (2 year cycle)** (Call to see if your registration is expired if unsure)*
*Inspection fee - **$150 single family** (every 2 years or change of tenancy)*
***Multiple Units - $150 + $60 for additional unit(s)** (ONLY applies to apartments and duplexes)*

### MANAGING AGENT INFORMATION
*If different from owner information*

| |
|---|
| Manager/Agent Full Name: |
| Person Responsible for Maintenance Name: |
| Street Address: |
| City, State, Zip:                                      Home Phone #:<br>                                                            Work Phone #: |
| Driver's License # and State of issuance, Michigan ID#, or if Corporate, Tax ID# |
| Email Address: |

*\*If property is owned or managed by more than one party, attach additional information on a separate piece of paper*

### PROPERTY OWNER INFORMATION

| |
|---|
| Owner's Full Name: |
| Street Address: |
| City, State, Zip: |
| Home Phone #:                          Work Phone #: |
| Driver's License # and State of issuance, Michigan ID#, or if Corporate, Tax ID#: |
| Email Address: |

### RENTAL PROPERTY ADDRESSES

| |
|---|
| Street Address: |
| Tenant's Name: |
| Tenant's Phone #: |

***\*If additional properties are owned, attach a list of properties on a separate piece of paper***

*See reverse side for conditions as well as signature block*

# Conditions:

*(Please initial at each of the six conditions – application is considered incomplete without initials)*

_____: I understand that the Property Registration and the property inspections must be made once every two years **or at change in occupancy**. Also required is a biennial Landlord Registration. Fees apply for both the Property and Landlord Registration. Additionally, I understand that it is my responsibility to schedule rental inspections with the City of Oak Park for <u>every</u> rental unit I own or manage, prior to leasing, renting, or advertising the property for rent within 30 days of registration.

_____: A Rental Certificate of Compliance for each unit will be issued following the inspector's findings that the property is not in violation of Oak Park's Code of Ordinance provisions. *I also understand that my rental properties will have to be re-inspected and inspection fees paid whenever there is a change in occupancy, re-letting of any unit, or when designated by the Rental Inspector.*

_____: I agree to inform the Technical and Planning Department of any changes in complete occupancy, re-letting, acquisition, or disposal of any rental units. **I hereby give consent to the Technical and Planning Department to enter any of the listed premises, if necessary at reasonable times, to inspect such premises when the property is vacant. If the property is occupied by a tenant(s) at the time of the inspection request, I agree to make good faith efforts to obtain the consent of at least one lessee for all future inspections.**

_____: I certify that all statements are true and complete as set forth in the City Code of Ordinances pertaining to my type of business as a Landlord. I understand that it is my responsibility to notify the City of Oak Park Assessors Office to remove the Principal Residence Exemption (PRE) status on my rental properties.

_____: This registration expires six months from the application date. If the property(s) is not certified within this timeframe, a new application fee will be required.

_____: I agree to *not* occupy the property(s) without a valid certificate of compliance, either upon re-occupancy or at the expiration of this two-year application.

NAME OF APPLICANT: _____

TITLE OF APPLICANT: _____

SIGNATURE OF APPLICANT: _____  DATE: _____

## OWNER AFFIDAVIT AND CERTIFICATION

I, by my signature, hereby make this affidavit in conjunction with an application for a license to rent property and landlord registration. I agree to permit the City of Oak Park Department of Technical and Planning and/or its appointees, to enter and perform inspections of the property when the property is vacant. If the property is occupied by a tenant(s) at the time of the inspection request, I agree to make good-faith efforts to obtain the consent of at least one lessee for all future inspections. I affirm that the tenant(s) of the property subject to this registration and license have been informed of the regulations contained in Chapter 18, Article IV, Divisions 2 and 3, of the Code of the City of Oak Park, and have been provided with a copy of this affidavit. I understand that if a lessee is not present at the time of inspection, the Department of Technical and Planning Services may rely upon my representation that at least one lessee has consented to the inspection.

Signature: _____

Printed Name: _____

Title:  _____

**Note: Corporate owners must attach a copy of the most recent Annual Report filed with the State of Michigan, and identify the title of the authorized officer/member signing on behalf of the corporate entity.

Subscribed and sworn to before me

This _____ day of _____, 20__

_____County, Michigan.

My Commission Expires:_____.

_____

Notary Signature

Print Name:

[Seal]